**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 97-7685

WILLIAM F. BRECKENRIDGE,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James H. Michael Jr., Senior District Judge.
(CR-90-209)

Argued: December 3, 1999

Decided: August 4, 2000

Before LUTTIG, MOTZ, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by unpublished opinion. Judge Motz wrote
the opinion, in which Judge Luttig joined. Judge Luttig wrote a con-
curring opinion. Judge Traxler wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** William Michael Merone, KENYON & KENYON,
Washington, D.C., for Appellant. Jean Barrett Hudson, Assistant
United States Attorney, Charlottesville, Virginia, for Appellee. **ON
BRIEF:** Edward T. Colbert, KENYON & KENYON, Washington,
D.C., for Appellant. Robert P. Crouch, Jr., United States Attorney,
Charlottesville, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

MOTZ, Circuit Judge:

William F. Breckenridge appeals the denial of his 28 U.S.C. § 2255 motion to vacate, set aside, or correct his sentence, which was imposed after his conviction for possession with intent to distribute. Breckenridge argues that he was improperly sentenced as a "career offender" because his six prior convictions for breaking and entering were "related" under U.S.S.G. § 4A1.2 as part of a "common scheme or plan," and that his trial counsel was ineffective for failing to point out the relationship between the prior offenses.

On previous consideration of Breckenridge's motion, we identified a number of critical similarities between Breckenridge's past offenses that gave rise to an inference of a common scheme or plan: all were burglaries of homes located in close geographic proximity to one another; all took place during the same four weeks in the spring of 1987; and all were committed for the same motive. See United States v. Breckenridge, 93 F.3d 132, 139 (4th Cir. 1996). We remanded for consideration of two narrow questions; if the district court found either that the six offenses shared a common modus operandi, or that the offenses would have been tried together but for an accident of geography, we held that a common scheme or plan for purposes of U.S.S.G. § 4A1.2 would be established, and Breckenridge would "be entitled to resentencing within the appropriate guideline range." Id. at 140. On remand, the district court found that neither condition existed, and that Breckenridge therefore was not entitled to relief. We reverse and remand for resentencing.

For the following reasons, we conclude that the district court clearly erred in finding that Breckenridge did not follow a common modus operandi in committing the six offenses. Indisputably, each offense involved a surreptitious entry, into the home of a stranger, at a time when the house was unoccupied. Other, more important simi-

2

larities are also uncontroverted. Breckenridge committed each offense with the encouragement and assistance of a single police informant, Clarence Bolton, who, on police instructions, approached Breckenridge prior to the commission of any of the six offenses and offered to buy stolen goods from him. Each of Breckenridge's 1987 offenses seems to have been committed, on Bolton's suggestion, during the evening hours. In each break-in, Breckenridge sought similar types of goods: household appliances, guns, jewelry, VCRs, and TV sets. And shortly after each burglary Breckenridge contacted Bolton to sell the stolen goods. These similarities substantially outweigh the few differences between the offenses: a slight deviation in the method of entry, the apparent ransacking of one house, the use by Bolton and Breckenridge of different rendezvous points, and the fact that Breckenridge did not sell every stolen item to Bolton. Some of the evidence establishing Breckenridge's modus operandi, including testimony from Breckenridge himself, did not emerge until the hearing on remand. The common modus operandi, in combination with other factors noted above, compels the conclusion that the six offenses were part of a common scheme or plan. See Breckenridge, 93 F.2d at 140.

We must remember that the only conduct at issue here is that which led to the six 1987 convictions. Breckenridge may very well have been engaging, as the dissent suggests, in an "ongoing series of offenses" prior to the police sting, post at 15, "choosing targets randomly and for convenience," post at 18, but we must focus on the six convictions alone, not on whatever conduct may have led the police to be suspicious of Breckenridge in the first place. Breckenridge was never convicted of any offenses aside from those that he committed in a four-week span, in residences located near one another, and with the encouragement and assistance of the police informant Bolton. All we decide here is that those six offenses were related.

Furthermore, the relative simplicity of Breckenridge's offenses should not weigh against a finding that they are related. Whether a group of past offenses is "related" under U.S.S.G. § 4A1.2 goes ultimately to determining whether a defendant deserves increased punishment for a present offense because of "the seriousness of the defendant's criminal history and the danger that he presents to the public." U.S.S.G. § 4A1.2, comment. (n.3). The Sentencing Commission has determined that if past offenses are part of "a common

3

scheme or plan," they are "related" and should not count separately against a defendant in assessing his criminal history. The Commission has not mandated, or even suggested, that "common scheme or plan" requires complicated crimes; relatively ordinary or "generic" offenses can just as readily constitute a common scheme or plan. The sophistication of the past offenses has no bearing on whether those offenses are "related" and certainly has no bearing on the ultimate assessment of the seriousness of the defendant's criminal history. To focus on sophistication of the modus operandi merely sets up an advantage at sentencing for clever or well-educated criminals; nothing indicates that the Sentencing Commission intended this result.

As the Seventh Circuit has observed in this context,"`scheme' and `plan' are words of intention, implying that the[offenses at issue] have been jointly planned, or at least that it have been evident that the commission of one would entail the commission of the other as well." United States v. Ali, 951 F.2d 827, 828 (7th Cir. 1992). This conception of "common scheme or plan"--offenses jointly planned regardless of complexity--has been adopted in some form by at least four other circuits. See United States v. Irons, 196 F.3d 634, 638 (6th Cir. 1999); United States v. Robinson, 187 F.3d 516, 520 (5th Cir. 1999); United States v. Hallman, 23 F.3d 821, 826 (3d Cir. 1994); United States v. Chapnick, 963 F.2d 224, 227 n.5 (9th Cir. 1992).

The linkage between Breckenridge's offenses is every bit as strong as that between the offenses considered in Robinson, in which the Fifth Circuit held that a defendant's drug sales to undercover police officers, one week apart, were part of a "common scheme or plan." During the first sale, after Robinson offered an undercover officer a commission for the referral of additional customers, the officer set up the transaction with a second officer. See Robinson, 187 F.3d at 520. The Robinson court viewed the two offenses as "more than merely repeated transactions, temporally and geographically alike." Id. Rather, the court found the offenses to be linked together by a joint plan, reasoning that "[t]he second offense was not a spur of the moment occurrence, but rather an action proposed and planned at the time of the first offense." Id. If anything, Breckenridge's offenses are more closely related than Robinson's because Breckenridge's offenses were proposed and planned, at least in rough outline, prior to the commission of any of the offenses, and because one police

4

informant--Bolton--played an identical role in each of the offenses. Thus, Breckenridge's offenses were not merely solved during the course of a single sting investigation; they were anticipated by the police in devising the sting.

The dissent contends that Bolton merely offered to serve as a conduit for stolen goods, and that there was therefore no joint planning between Breckenridge and Bolton. Bolton testified, however, that at the initial meeting of the two, prior to the commission of any of the offenses, he asked Breckenridge if he "could obtain" stolen goods, and Breckenridge "agreed that he would be able to do so." Breckenridge testified on remand that Bolton instructed him to obtain certain kinds of goods, and to contact Bolton after each burglary at "around ten or 11:00 at night." Both Bolton and Breckenridge described joint planning of future burglaries, not an offer by Bolton to serve as a conduit for goods obtained during an ongoing series of burglaries. They each described an exchange similar to the one between the defendant and the undercover police officer in Robinson .

Accordingly, we reverse and remand for resentencing.

REVERSED AND REMANDED

LUTTIG, Circuit Judge, concurring:

I believe that our opinion in United States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996) ("Breckenridge I"), is seriously flawed. From what he has written herein in dissent, I believe it plain that Judge Traxler now believes the same. Nonetheless, Breckenridge I is the law of the circuit and, as such, I am bound by that decision. In my judgment, Judge Motz has correctly analyzed the two factors of modus operandi and "but-for" consolidation, which, in Breckenridge I, we instructed the district court to consider on remand. For this reason, I concur in Judge Motz's opinion for the court. I appreciate Judge Traxler's efforts at the contrary analysis, but I ultimately find that analysis forced, a consequence no doubt of the limitations to which he is subject because of our opinion in Breckenridge I .

TRAXLER, Circuit Judge, dissenting:

In United States v. Breckenridge, 93 F.3d 132 (4th Cir. 1996) ("Breckenridge I"), we considered the motion of William F. Brecken-

5

ridge ("Breckenridge"), made pursuant to 28 U.S.C.A. § 2255 (1988), to vacate, set aside or correct his sentence. Because we needed additional findings to determine whether the district court properly denied that motion, we remanded the case to the district court to answer two questions, and in doing so, we preordained the ruling that would occur when the questions were answered. Because the findings made by the district judge were correct, I believe we should now direct the result we forecasted in Breckenridge I and affirm the district court's denial of Breckenridge's § 2255 motion. Accordingly, I respectfully dissent.

I.

The background of this case is set out in our previous opinion and can be summarized as follows: In 1991, Breckenridge was convicted in district court of possession with intent to distribute crack cocaine. His sentence was substantially affected by whether he was properly categorized as a career offender as defined in U.S. Sentencing Guidelines Manual § 4B1.1 (1990).[1] This classification turned on whether Breckenridge had two prior felony convictions of a crime of violence. His criminal history revealed that he had been convicted in Charlottesville, Virginia, of five burglaries and of an additional burglary in neighboring Albemarle County. Burglary of a dwelling is a crime of violence. See U.S.S.G. § 4B1.2(1)(ii). Breckenridge was sentenced to 12 months imprisonment each for four of the Charlottesville burglaries, and to five years imprisonment for the fifth offense.[2] See J.A. 453-454. In Albemarle County he received a six-month suspended sentence. See Breckenridge I, 93 F.3d at 135.

_____

[1] Under U.S.S.G. § 4B1.1,"[a] defendant is a career offender if (1) the defendant was at least eighteen years old at the time of the instant offense, (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

[2] Although each offense involved breaking into a dwelling to commit a felony, only one of the convictions was for burglary in the nighttime. The others were deemed to have been committed during daylight hours and constituted "statutory burglary," hence the difference between the five-year sentence and the others.

6

Although the burglaries were six in number, the Guidelines provide that the prior sentences therefor be examined and a determination made as to whether those sentences should be counted separately under U.S.S.G. § 4A1.1(a), (b), or (c). See U.S.S.G. § 4B1.2(3). This decision hinges on whether the prior cases were unrelated, because the Guidelines state that prior sentences in unrelated cases are to be counted separately, whereas sentences for related cases are treated as one sentence. See U.S.S.G. § 4A1.2(a)(2). The commentary to that section defines related prior sentences as those which: "(1) occurred on a single occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing." U.S.S.G. § 4A1.2, comment. (n.3).[3]

II.

A.

In examining Breckenridge's claim that all six of his burglaries were committed pursuant to a single common scheme or plan, see U.S.S.G. § 4A1.2, comment. (n.3), we took note in Breckenridge I of the circumstances involved in the burglaries. The cases were solved by law enforcement officers using an informant ("Bolton"), who at their direction made himself available to buy items stolen by Breckenridge. Bolton had been arrested by Charlottesville police on a drug charge and wanted to assist law enforcement to improve his situation. Officer J.E. Harding of the Charlottesville Police Department had been investigating Breckenridge for a series of break-ins and he sought to use Bolton to catch Breckenridge since Bolton lived in the same area and knew Breckenridge. Breckenridge thereafter sold some of the goods he stole to Bolton, who tape-recorded their conversations. Based on identification of the goods, law enforcement officers were then able to arrest Breckenridge for the burglaries in question.

_____

[3] In Breckenridge I, the record before us reflected that the five Charlottesville burglaries had been consolidated for trial by court order. The parties have since discovered that the joinder had been by consent. There is no need here to go into the consequences of that difference because the answers to the pivotal questions we posed in Breckenridge I still control our disposition.

In Breckenridge I, we felt there were facts indicating the possibility of a single common scheme or plan, but that they were not sufficient to justify such a conclusion. We declined, therefore, to make an ultimate finding that a single common scheme or plan existed because we believed there were two additional factors that needed to be examined before such a determination could be made. I now address these factors in turn.

B.

First, in Breckenridge I, we recognized the need to decide whether the six crimes shared a common modus operandi . This factor had not yet been assessed because facts relevant to it were not in the record. Accordingly, we remanded the case to the district court for fact-finding on the modus operandi question, and we pointed out the importance of this factor:

> If the evidence demonstrates that the sixth offense exhibits the same modus operandi as the other five, then in view of the other facts--the same substantive offenses committed close in time and place, and for the same motive--the offenses should be regarded as having been part of a common scheme or plan for purposes of § 4A1.2.

Breckenridge I, 93 F.3d at 139.

Modus operandi refers to a criminal's "[m]ethod of operation or doing things (M.O.)." Black's Law Dictionary 1004 (6th ed. 1990). Specifically, it is a "[t]erm used by police and criminal investigators to describe the particular method of a criminal's activity" and "refers to a pattern of criminal behavior so distinct that separate crimes or wrongful conduct are recognized as work of [the] same person." Id. Thus, the district court was to receive additional evidence on the methods by which all the burglaries were committed, with a particular eye on the Albemarle offense as compared to the others, to see if all six showed a distinctive pattern unique to the work of one person.

At this point it is important to remember that we had a lot of information before us in Breckenridge I that showed substantial similari-

8

ties in the burglaries; but we could not make a decision about modus operandi from those facts. Consequently, we held that the following known facts were insufficient to show a common modus operandi:

> Each felony was for breaking and entering and grand larceny of a private residence. The residences were located in close geographic proximity to each other and the offenses all occurred during the same one month period in 1987. Five burglaries occurred in the City of Charlottesville and one in adjoining Albemarle County, on the street bordering the two jurisdictions. Similar items--video cassette recorders, jewelry, and guns--were stolen in each case.

>  . . . [T]he police targeted Breckenridge for a sting operation in which an informant attempted to purchase stolen items from him. Each transaction between the informant and Breckenridge was tape recorded by the informant. The transcript of the tapes reveals that the informant commissioned Breckenridge to obtain particular items--video cassette recorders and televisions--the next time he "went out." The sting operation was successful; the police were able to connect items sold to the informant by Breckenridge to all six burglaries.

Breckenridge I, 93 F.3d at 134-35. In spite of these particulars, we believed details about the individual break-ins were needed to answer the modus operandi question, and we returned the case to the district court for fact-finding on this issue.

On remand the evidentiary questions were sent by the district court to a magistrate judge for a report and recommendation. Submitted for the record there were the transcripts of the Charlottesville trial and the Albemarle plea, which revealed the details of the offenses. The magistrate judge also took testimony from Breckenridge's attorney in the state court proceedings and from the Charlottesville prosecutor. While acknowledging similarities in the offenses, the magistrate judge nevertheless found there was not a common modus operandi and he forwarded the record to the district judge.

After receiving objections from Breckenridge to the report of the magistrate judge, the district court conducted a hearing during which

9

he heard additional testimony from Breckenridge's state court attorney, and from Breckenridge himself. The district court then issued his opinion also finding there was no common modus operandi: "While all the offenses were committed in a similar manner, that manner was not unique in any way: he broke, he entered, he took things." Breckenridge v. United States, 977 F. Supp. 766, 770 (W.D. Va. 1997).

This conclusion is sound. While there were certainly similarities as there generally are when the same person commits a series of similar offenses, there were significant variations which justified the district judge's decision. The evidence was uncontradicted that different methods of entry were used. Sometimes Breckenridge went in through windows, but on one occasion he went through a door. The windows entered in Charlottesville were on the back of the house, while the window used in Albemarle was in the front living room. In Albemarle the window was broken to gain entry, while the windows in Charlottesville were not. A pry tool appears to have been used once, but not on other houses. At least one house was ransacked, but others were barely disturbed. The items stolen were similar--guns, VCRs, jewelry and coins--but hardly unique as these easily disposable items are common objects of theft from homes. Different items were taken from different homes. Most items, but not all, were sold to Bolton. Sometimes Breckenridge directed Bolton where to drive so Breckenridge could retrieve the hidden goods. On at least one occasion, Breckenridge brought the goods to Bolton's room. After the Albemarle theft, Breckenridge approached Bolton on a basketball court to make a sale. Of note, the May 14 Albemarle burglary occurred some period of time from those in Charlottesville, which occurred on April 18, 19, 22, 26 and 27. In other words, the break-ins of the houses in Charlottesville occurred on almost a daily basis. The delay in time of the Albemarle burglary is indicative that it was not part of any plan under which Breckenridge broke into the Charlottesville residences.

Breckenridge argues that there were sufficient similarities in his mode of operation. The uncontested facts in this regard are that he surreptitiously went into residences of people he did not know when the victims were not at home. This practice, however, would fit almost every burglary. At the hearing before the district judge after remand and at a time when Breckenridge's conviction was final and

10

the importance of his modus operandi obvious, Breckenridge himself took the stand to add that he chose the Albemarle location the same way as the others (but without specificity as to how), and he knocked on the door there to make sure no one was at home, which he always did. He further said he timed his break-ins for early evening because calls to Bolton were to be made around 10:00 p.m. to 11:00 p.m. Even assuming what Breckenridge said is true, these facts fall far short of establishing a common modus operandi.[4]

None of these circumstances relied on by Breckenridge would have alerted law enforcement that all of these burglaries were the work of one person. For example, the fact that no one was at home and the fact that this was verified by Breckenridge would tell the police nothing. The vast majority of homes that are broken into are unoccupied at the time, and law enforcement would certainly have no way of knowing if the thief had verified this or not. Likewise, the timing of the thefts was not evident to anyone. Because the victims had left their homes, some for substantial periods of time before returning to find the break-ins, it was difficult for the victims and law enforcement to know exactly when the crimes had occurred. Indeed, the transcript of the Charlottesville trial showed the difficulty the prosecutor had in proving whether the offenses occurred before or after dusk, an element important to determining whether a crime was a nighttime burglary, or a statutory burglary occurring during the daylight.

In short, nothing was added on remand to what we already knew in Breckenridge I to help show a common modus operandi. To the contrary, the new evidence is that the methods varied significantly and there was no common modus operandi.

What the district judge realized, and what is obvious now that

_____

[4] There were obvious reasons for disbelieving Breckenridge. Although Breckenridge swore during the Charlottesville state court trial that he did not commit any of these burglaries, see J.A. 391, he testified before the district court, in effect, that he did, see J.A. 627. He further testified at the Charlottesville trial that he had never sold stolen merchandise to Clarence Bolton, see J.A. 392, but before the district court he testified about the arrangements he had made with Bolton to transfer the stolen goods, see J.A. 628-29.

11

details about the burglaries have been presented, is that these six offenses were generic break-ins. They were crimes of opportunity where Breckenridge utilized any means available, as is common with most burglars. The result is that both the magistrate judge and the district judge properly decided there was no common modus operandi in the commission of the six burglaries by Breckenridge. We review the district court's legal determinations de novo, see United States v. Nale, 101 F.3d 1000, 1003 (4th Cir. 1996), and its findings of fact for clear error, see United States v. Crump, 120 F.3d 462, 468 (4th Cir. 1997). Here, there was no error at all. Accordingly, the question we asked regarding modus operandi should go against Breckenridge.

C.

The second factor we identified as important and in need of scrutiny involved the question of "whether the Albemarle County offense was tried and sentenced separately from the Charlottesville offenses only because of an accident of geography." Breckenridge I, 93 F.3d at 139. We noted this decision depended on Virginia's law controlling joinder of offenses for trial and specifically on whether all six of the offenses met Virginia's definition of common scheme or plan as set out in Spence v. Commonwealth, 407 S.E.2d 916 (Va. Ct. App. 1991), a test we directed be used. For clarity and direction we quoted the standard, which bears repeating here. Under Spence, consolidation "`depend[s] upon the existence of a plan that ties the offenses together and demonstrates that the objective of each offense was to contribute to the achievement of a goal not obtainable by the commission of any individual offenses.'" Breckenridge I, 93 F.3d at 139 (quoting Spence, 407 S.E.2d at 918).

Apparently the magistrate judge and the district judge believed resolution of this question went to the issue of consolidation for trial under the third prong of the Guideline's definition of related cases; and since there had actually been no judicial consolidation, they did not address it. Our belief, however, was that the issue was appropriate to whether there was a common scheme or plan. All the cases had obviously not been consolidated; so we viewed the question of whether they could have been, if they all had occurred in one jurisdiction, to be another factor for consideration on the common scheme or plan prong.

12

Despite the fact that we have no ruling below, we do have enough uncontested facts about the burglaries before us to answer the question ourselves. These cases do not meet Virginia's test for consolidation. The facts clearly show that in the Albemarle burglary, as in all the burglaries, Breckenridge had his own individual goal of acquiring goods to sell for money. There was no goal involved that was not obtainable by this individual offense. It was a simple common burglary, complete in itself and not a part of an overall scheme to achieve any greater objective. Consequently, under the test we directed be used, we cannot say that the Albemarle burglary would have been consolidated for trial with the Charlottesville offenses but for an accident of geography, and the answer to our second question should again be adverse to Breckenridge.

III.

With both questions now answered, the result is one prescribed by Breckenridge I, wherein we held:

> If . . . the Albemarle County offense neither shared the same modus operandi as the Charlottesville offenses nor would have been consolidated for trial with them but for an accident of geography, then the offenses cannot be regarded as related for purposes of sentencing as a career offender.

Breckenridge I, 93 F.3d at 140. Since the six burglaries were not part of a single common scheme or plan, they were not related as that term is used in the Guidelines, and Breckenridge was therefore properly sentenced as a career offender. There obviously then was no deficiency in his counsel's failure to raise the issue at sentencing.

The result I believe we should reach that there was not a single common scheme or plan at work here is in keeping with the intent of the Guidelines as expressed in Application Note 9 to Section 1B1.3, adopted after Breckenridge's sentencings, wherein the United States Sentencing Commission provided a definition and illustration of what was meant by "common scheme or plan."[5] The distinction drawn

_____

[5] The Guidelines note reads as follows:

13

there between "common scheme or plan" and"same course of conduct" is particularly helpful because the series of burglaries Brecken-

_____

"Common scheme or plan" and "same course of conduct" are two closely related concepts.

(A) Common scheme or plan. For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi. For example, the conduct of five defendants who together defrauded a group of investors by computer manipulations that unlawfully transferred funds over an eighteen-month period would qualify as a common scheme or plan on the basis of any of the above listed factors; i.e., the commonality of victims (the same investors were defrauded on an ongoing basis), commonality of offenders (the conduct constituted an ongoing conspiracy), commonality of purpose (to defraud the group of investors), or similarity of modus operandi (the same or similar computer manipulations were used to execute the scheme).

(B) Same course of conduct. Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (e.g., a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals).

14

ridge committed fits much more neatly into the definition of "same course of conduct" than it does "common scheme or plan." What we really had here was an ongoing series of offenses that as such would not now be properly classified as a common scheme or plan. Thus, there is further reason for me to believe the result reached by the district judge was correct.

IV.

The method of analysis we set forth in Breckenridge I for determining a single common scheme or plan involved the multifactor test previously described. By reference to United States v. Ali, 951 F.2d 827 (7th Cir. 1992), however, a new test has been added to the mix. The standard set forth in Ali is one which has gained increasing acceptance by the circuits over the past eight years.**6** See, e.g., United States v. Hallman, 23 F.3d 821 (3d Cir. 1994); United States v. Robinson, 187 F.3d 516 (5th Cir. 1999); United States v. Irons, 196 F.3d 634 (6th Cir. 1999); United States v. Berry, 212 F.3d 391 (8th Cir. 2000).

Judge Posner, writing for a panel of the Seventh Circuit in Ali, dealt with a defendant who asserted that relatedness existed between his previous convictions for robbery of a supermarket and the subsequent forgery of a money order taken along with other items in that theft. Id. at 827. Ali held that the two crimes were not part of a common scheme or plan because the decision to commit the forgery did not arise until after the defendant discovered the money order in the proceeds from the robbery. In rejecting the defendant's claim, the court stated: "But `scheme' and `plan' are words of intention, implying that the forgery and the robbery have been jointly planned, or at least that it have been evident that the commission of one would entail the commission of the other as well." Id. at 828. By way of further definition the court gave examples of how its standard would apply:

_____

**6** Although Ali may provide a sound test for determining a single common scheme or plan, we are bound by the standard we set forth in Breckenridge I. See, e.g., United States v. Ruhe, 191 F.3d 376, 388 (4th Cir. 1999) ("[A]s a simple panel, we are bound by prior precedent from other panels in this circuit absent contrary law from an en banc or Supreme Court decision.").

15

No one robs without intending to obtain value from what is taken, and if that is a financial instrument on which a signature must be forged if it is to be cashed or otherwise used to the robber's profit the forgery could easily be thought a part of a single scheme or plan. . . . If the decision to commit forgery arose only after the robber discovered what he had taken, the forgery would be no more a part of the scheme or plan to rob than would be retaliation against a witness of whose existence the retaliator was unaware when he planned the crime to which the witness has testified. . . . A crime merely suggested by or arising out of the commission of a previous crime is not (to repeat our essential holding) related to the earlier crime in the special sense of being part of a common scheme or plan.

Id.

If the Ali test is used here, then clearly the six burglaries were not part of a single common scheme or plan. First, the burglaries were not jointly planned. There is no evidence Breckenridge planned all of these crimes on one occasion. In fact the evidence is that he was already a suspect in ongoing housebreakings before Bolton was ever caught and that Bolton only provided an outlet for some of the goods stolen after Bolton's involvement. Neither the law enforcement officer, nor Bolton, nor Breckenridge testified to any joint planning. The officer testified about how he came to use Bolton:

So I met with John Lowe and Clarence Bolton and we talked about things that he might be able to do for law enforcement that could improve his position. I went up there with the idea of talking about drug cases but then it hit me that I knew that Clarence had spent some time living down in the 10th Street area that maybe he knew William Breckenridge. So I asked him if he thought there was a chance he might try buying stolen goods from Mr. Breckenridge from breaking and enterings that I felt like he was committing. . . .

J.A. 26. Bolton described in his testimony how he approached Breckenridge. As is obvious, there was no effort on Bolton's part to do anything other than to offer himself as a conduit for stolen goods.

16

Q Were you asked if you could assist the Charlottesville Police Department in any way with respect to William Breckenridge and if so, in what way?

A Yes, I was and Mr. Harding asked me if I thought I could tap in on anything William was doing or on his suspected break-ins.

Q Did you know William Breckenridge at that time?

A Yes, I did know him.

Q How well did you know him then?

A Did not know him that well, just, you know, in passing. He had confronted me on a couple of occasions, a few occasions, with regards to goods that he was trying to get rid of.

. . . .

Q What happened after this suggestion was made to you by Detective Harding as far as any contact you had with William Breckenridge?

A Detective Harding left town and he went to Los Angeles and I gave him my word that I would see what I could do, I'd give it my best effort. I saw William while he was gone just in passing one night and mentioned--mentioned to him the fact that I was interested in, you know, the possibility of purchasing some goods from him if he could attain them. He agreed that he would be able to do so and we left it at that. We left each other with the understanding that he would contact me whenever he felt ready to do so.

J.A. 76-77. Breckenridge himself, if to be believed, stated only that Bolton told him what type items Bolton would be interested in:

Q When you first met with Mr. Bolton--when did you first meet with Mr. Bolton before all these offenses?

17

A I met Mr. Bolton in March of that same year.

Q And what did he specifically request you to do?

A He requested for me to give him household appliances, VCR's, whatever.

Q Are there other items that he requested?

A Yes; guns, jewelry.

Q Did he also request television sets?

A Yes.

J.A. 629. There is simply no evidence that any of these burglaries had a common origin or were otherwise jointly planned. Breckenridge was a common criminal of opportunity, choosing targets randomly and for convenience. The only common design was to break into homes and steal those things for which there was a ready market. Under Ali such would not qualify as a common scheme or plan under the first part of the test, which requires joint planning. Nor would these crimes pass the second part of Ali, as there is no evidence the commission of one burglary involved as a necessary consequence the commission of any other burglary. The basis for Ali was that there must be a pre-offense intention to carry out all of the other offenses, regardless of other similarities in the offenses. Here, there is no evidence that any of the particular burglaries shared such a pre-offense intention. Consequently, if Ali is to provide the touchstone by which crimes are to be determined to be related or unrelated, then Breckenridge must fail here as well.

The opinion of the Fifth Circuit in United States v. Robinson is also of no help to Breckenridge. There the prior offenses committed by the defendant were for two sales of cocaine, one occurring on June 17 and the other on June 24. The two cases were found to be related because during the first sale of cocaine by the defendant to an undercover agent, the defendant told the agent the defendant would pay him $50 if the agent could refer other customers to the defendant. The sec-

18

ond sale seven days later was pursuant to such a referral. Because the second sale was planned during the first sale and would not have occurred but for the first sale, the court held the two were related. <u>See</u> 187 F.3d at 518-20.

Whether <u>Robinson</u> is a correct extension of <u>Ali</u> is debatable, but an obvious difference between <u>Robinson</u> and the case before us is that there is no evidence about the planning of Breckenridge's burglaries, much less that he plotted them with anyone else. Nor does Bolton's involvement make <u>Robinson</u> analogous. Bolton at best only offered himself as an outlet for some of the items stolen. He did not instigate the break-ins or help plan them. His participation was limited to receiving some of the stolen goods. The crimes we are assessing are the burglaries. Bolton would not have been involved unless the houses had contained items Bolton was interested in purchasing and Breckenridge had in fact stolen those items and sold them to Bolton. To believe that Bolton precipitated the burglaries, one would have to presume, among other things, that Breckenridge knew what items were in the homes before he broke into them, and such a presumption is completely without a factual basis. Consequently, Bolton's purchases did not in any way mean that the commission of one burglary would necessarily entail another.

V.

All in all, the burglaries Breckenridge committed should not be considered related under U.S.S.G. § 4A1.2, comment. (n.3). Therefore, I believe the lower court decision should be affirmed.

19